UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division
**Case Number:  07-60209-CIV-MARTINEZ-BROWN**

JOHN N. ("JACK") HEARN, CHRISTOPHER
O. BARTLETT, JOHN ROUSSELLE,
TIMOTHY HARKINS, AND HENRY P.
MALLON,
      Plaintiffs,

vs.

MICHAEL MCKAY et. al.,
      Defendants.
_____/

## COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court held a non-jury trial in this case on July 7, 8, and 9, 2008. Plaintiffs filed a

Complaint against Defendants, alleging violations of the Labor Management Reporting and

Disclosure Act ("LMRDA"), 29 U.S.C. § 401 *et seq*. and the Labor Management Relations Act

("LMRA"), 29 U.S.C. § 185 *et seq*.[1] *See* (D.E. No. 1).  The Complaint was originally filed

against the American Maritime Officers Union ("AMO") and a number of current and former

officers of the AMO.  Counts I and III asserted against both the AMO and the individual officers

alleged violations of section 101(a)(2) of the LMRDA, 29 U.S.C. § 411(a)(2) and section 301(a)

of the LMRA, 29 U.S.C. § 185(a) respectively.  These claims in Count I and III, as well as all

claims against Defendants Edward Kelly and John Hafner, were dismissed pursuant to the

_____

[1]Defendants Thomas Bethel, Donald Nilsson, Paul Cates, Daniel Smith, Donald Cree,
Joseph Gremelsbacker, Robert Kiefer, Edward Kelly, and John Hafner asserted a Cross Claim
against Defendants Michael McKay and Robert McKay, arguing that "the Court should find any
damages or any other relief in this matter are solely attributable and exclusive to the Co-
defendants Michael R. McKay and Robert McKay, and the Court should enter judgments for
damages, if any, . . .  solely and exclusively . . . against these co-defendants."  (D.E. No. 62 at
12).

parties' joint stipulation of dismissal.  *See* (D.E. No. 192).  In addition, by dismissing Counts I

and III, no claims remained pending against Defendant the American Maritime Officers Union

("AMO").

　　　After this dismissal, only Count II, asserting a violation of section 501(a) of the LMRDA,

29 U.S.C. § 501(a) remained pending against Defendants Michael McKay, Robert McKay,

Thomas Bethel ("Bethel"), Donald Nilsson ("Nilsson"), Paul Cates ("Cates"), Daniel Smith

("Smith"), Donald Cree ("Cree"), Joseph Gremelsbacker ("Gremelsbacker"), and Robert Kiefer

("Kiefer"). The Court then granted in part and denied in part a motion for summary judgment on

this count filed by Defendants Bethel, Nilsson, Cates, Smith, Cree, Gremelsbacker, and Kiefer.[2]

*See* (D.E. No. 199).  In granting in part this motion for summary judgment, no claims remained

pending against Defendant Cates. A Clerk's Default for failure to answer or otherwise respond to

the Complaint was entered against Defendants Michael McKay and Robert McKay, *see* (D.E.

Nos. 32, 45), and this Court has separately entered Default Final Judgments against Defendants

Michael McKay and Robert McKay.

　　　The only claims which remain for this Court to resolve are Plaintiffs' Count II claims that

the remaining non-defaulting Defendants breached their fiduciary duties relating to the awarding

of year-end bonuses and the rigging of elections and referenda. The Court has carefully

considered the testimony of the witnesses, the exhibits in evidence, the applicable law, and the

---

　　　[2]Summary judgment was granted as to Plaintiffs' Count II claims against Defendants
Bethel, Nilsson, Cates, Smith, Cree, Gremelsbacker and Keifer on the claims relating to the
misuse of the jointly administered funds,  relating to the reimbursement of the Safety Education
fund, and relating to their failure to file sufficient LM-2 Reports. *See* (D.E. No. 199 at 24).
Summary judgment was also granted as to Plaintiffs' Count II claims against Defendant Paul
Cates as to the issuance of year-end bonuses in 1998 and 1999 and on Plaintiffs' claims in Count
II against Defendants Nilsson, Cates, Smith, Cree and Keifer as to the rigging of elections. *Id.*

arguments presented by counsel.  The Court now enters the following findings of fact and

conclusions of law in accordance with Federal Rule of Civil Procedure 52.  Any findings of fact

which should be treated as conclusions of law are to be treated as such, and any conclusions of

law that should be treated as findings of fact should also be treated as such.

## I.  Findings of Fact

Plaintiffs and Defendants are members of the former Defendant AMO, which is a

maritime labor organization headquartered in Dania Beach, Florida.  (D.E. No. 190, Joint

Stipulation at 6-8.  Its members are licensed officers in the United States merchant marine fleet

that operate ocean-going commercial vessels and commercial vessels on inland waters in the

United States.  *Id*. at 6.

### A.     Parties

Plaintiffs were all unsuccessful candidates for office in the December 6, 2006 AMO

National Officers Election.  *Id*.  Specifically, Plaintiff John N. Hearn ("Hearn") was an

unsuccessful candidate for AMO National President, Plaintiff Christopher O. Bartlett ("Bartlett")

was an unsuccessful candidate for AMO National Executive Vice President, Plaintiff Tim

Harkins ("Harkins") was an unsuccessful candidate for AMO National Vice President, Deep Sea,

Plaintiff John Rousselle ("Rouselle") was an unsuccessful candidate for AMO National Assistant

Vice President, At Large, and Plaintiff Henry Mallon ("Mallon") was an unsuccessful candidate

for AMO National Executive Board Member, Inland Waters.  *Id*. The AMO has since held a

rerun election in June of 2008 and Plaintiff Christopher Bartlett is the current AMO National

Executive Vice President. (D.E. No. 229 at 4); (D.E. No. 230 at 3).  All other Plaintiffs remained

unsuccessful in their bids for office.  *See id*.

-3-

The individual Defendants are all either current or former officers of the AMO. Defaulting Defendant, Michael McKay, was the AMO National President from 1994 until January 5, 2007.  (D.E. No. 190, Joint Stipulation at 7).  He was forced to resign following his felony convictions for violations of the LMRDA and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), in *United States v. Michael McKay*, *et al.,* case number 05-60149-CR-COHN.  *Id.*  Defaulting Defendant Robert McKay is Michael McKay's brother and was the AMO Secretary Treasurer from 1994 until he was defeated in the December 6, 2006 election. Robert McKay was also convicted of violations of the LMRDA and RICO in *United States v. Michael McKay, et. al.*, case number 05-60149-CR-COHN.  *Id.*

The remaining non-defaulting Defendants are all former members of Michael McKay's administration who with one exception also hold current positions in the AMO. Defendant Bethel was previously an AMO National Assistant Vice President, and on December 6, 2006, he was a successful candidate for election to the position of AMO National Executive Vice President.  *Id*. at 7.  Bethel Tr. Testimony July 7 at 30, 90, 96.[3]  He also served as the AMO National President after Michael McKay resigned.  D. Exh. 124.  In the rerun election held in June of 2008, he was elected AMO National President.  Bethel Tr. Testimony July 7 at 30.

 Defendant Nilsson was a representative of the AMO, and as of January 1, 2002, he is a member of the AMO National Executive Board.  (D.E. No. 190, Joint Stipulation at 7); Nilsson Tr. Testimony July 8 at 181. Defendant Smith served as AMO National Vice President, Great Lakes.  (D.E. No. 190, Joint Stipulation at 7-8).  On January 8, 2007, Defendant Smith became

---

[3]The citations to the transcript are to the rough transcript of the trial.  Each new day of trial starts over at page 1.

the AMO National Executive Vice President, in which office he served until he was defeated by

Plaintiff Bartlett in the June 24, 2008 rerun election. Smith Tr. Testimony July 9 at 26-29.

Defendant Cree was the AMO National Assistant Vice President, Great Lakes, and as of January

8, 2007, he is the AMO National Vice President, Great Lakes.  (D.E. No. 190, Joint Stipulation at

8); Cree Tr. Testimony July 9 at 77.  Defendant Gremelsbacker was a member of the AMO

National Executive Board, and as of January 1, 2002, he is the AMO National Vice President,

Deep Sea.  Gremelsbacker Tr. Testimony July 7 at 125.   Defendant Kiefer was a member of the

AMO National Executive Board, and as of 2005, he is the AMO National Assistant Vice

President, At Large.  (D.E. No. 190, Joint Stipulation at 8).

### B.      Criminal Investigation and Internal Investigation

In 2000, the United States Department of Justice ("DOJ") began a criminal investigation

to determine whether certain AMO officers used their position to violate federal law.  *Id*. at 9.

Upon receipt of grand jury document subpoenas by the DOJ, the AMO through its National

Executive Board[4] retained special counsel, Joseph diGenova and his firm diGenova & Toensing,

to advise and assist the AMO in fully cooperating with the government investigation.  Bethel Tr.

Testimony July 7 at 78-79. The AMO also initiated an internal investigation which was

coordinated by special counsel and two FBI agents, Joseph Lucca ("Lucca") and Raymond Maria

("Maria").  *Id*. at 79, 146-47.  Lucca Tr. Testimony July 9 at 58-59.

One of the matters which was investigated was the current officers' knowledge regarding

---

[4]The National Executive Board is comprised of the National President, National
Secretary-Treasurer, National Executive Vice President, the National Vice President, Deep Sea,
the National Vice President, Great Lakes, the National Vice President At Large, the National
Assistant Vice Presidents, Great Lakes, the National Assistant Vice President, Deep Sea and six
National Executive Board Members.  D. Exh. 100, Art. VI § 4(a).

whether then-President McKay had granted bonuses as reimbursement for campaign contributions to Congressman Bud Shuster in 1998 and 1999.  Lucca Tr. Testimony July 9 at 58-59. Lucca and Maria conducted numerous face-to-face interviews with union officials and the officers' statements in regard to the bonuses were consistent with each other.  *Id*. at 59, 64-65. The interviews were not conducted under oath.  *Id*. at 66.  However, all the officers interviewed stated that there was no connection between the bonuses and the political contributions.  *Id*. at 64-65.[5]

In October 2001, special counsel advised the National Executive Board that after interviews with union officials and a review of financial records, "he had found little or nothing to question," and he found "no evidence of financial irregularities on the union's side." D. Exh. 119 at 3-4.[6]  He also stated that he found no need for a "broad based comprehensive review of the AMO."  *Id*. at 3. Special counsel did recommend that the AMO undertake certain steps to establish guidelines of conduct for officers, and controls and procedures for incoming and outgoing funds.  *Id*. at 3-4.  He also recommended that the AMO hire two former FBI agents, Dan Sullivan and Dan Anderson, to help implement these recommendations.  *Id*. at 4.  The AMO followed each of these recommendations.  Bethel Tr. Testimony July 8 at 147-49.

In June 2005, defaulting Defendants, Michael McKay and Robert McKay were indicted.[7] (D.E. No. 190, Joint Stipulation at 9). A superseding indictment was filed in July 2005, and in

---

[5]Lucca also testified that he has since learned that Thomas Kelly, one of the officers interviewed, testified in the criminal trial that he lied in his interview with Lucca and that the bonuses were awarded for political contributions.  Lucca Tr. Testimony July 9 at 67-68.

[6]This is also Plaintiffs' Exhibit 160.

[7]The indictment was also filed against Phillip Ciccarelli and James Lynch.

September of 2005, a second superceding indictment was filed. *Id*. These indictments were sealed and not unsealed until September 14, 2005.   (D.E. Nos. 2, 8,12, and 25 in Case No. 05-60149-CR-COHN).  In the second superceding indictment, the McKays were alleged to have participated in a racketeering conspiracy to enrich themselves and others "through among other things, theft and embezzlement from an ERISA plan, theft and embezzlement from a labor organization, bribery and graft connected to an ERISA plan, mail fraud, and honest services fraud."  P. Exh. 182 at 9.

Both Michael McKay and Robert McKay were also charged with mail fraud in violation of 18 U.S.C. § 1341 and failure to maintain records as required by the LMRDA in violation of 29 U.S.C. §§ 436 and 439(a).  P. Exh. 182.  Michael McKay was also charged with theft or embezzlement from an employee benefit plan in violation of 18 U.S.C.§ 664 and falsification of required records and certified information pertaining to an employee benefit plan in violation of 18 U.S.C. § 1027.  *Id*.  In addition, Robert McKay was charged with embezzlement from a labor organization in violation of 29 U.S.C. § 501(c) and false entry in records required by the LMRDA in violation of 29 U.S.C. §§ 436 and 439(c).  *Id*.  None of the other Defendants named in this case were indicted.

After the indictment was unsealed, AMO's National Executive Board suspended the McKays' check-writing privileges for the union and Robert McKay was required to resign as a union-designated Trustee to various employee benefit plans. Bethel Tr. Testimony July 7 at 83-84.  In addition, on September 29, 2005, a special meeting of the AMO's National Executive Committee was held.  *Id*.  The purpose of the meeting was to review and discuss the allegations in the indictment.  *Id*.

The McKays were present at this meeting, but they were asked to leave the room for a time so that questions could be asked of special counsel and General Counsel Joel Glanstein. *Id.* at 85. Special Counsel diGenova advised that pending the McKays' trial, there "should be no concern over the union structure and management." P. Exh. 161 at 5.[8]  He further advised that "the only problem so far was with Michael and Robert McKay signing checks and that was already remedied." *Id.*  At this meeting, the McKays were asked about each and every allegation in the indictment. Bethel Tr. Testimony July 7 at 85.  The McKays denied all of the charges and said that they would be proven innocent in a court of law. *Id.*

The National Executive Committee decided not to remove the McKays from office based on special counsel's advice and decided to "stay the course" or leave things as they were while the action against the McKays proceeded. *Id.* at 88.  Bethel testified that this decision was made based on the advice of special counsel. *Id.* at 88-89.  Specifically, the committee considered his statements that the indictment was merely allegations and at that time, there was no proof as the government would not release any evidence to the union nor would the union want to interfere in an ongoing investigation. *Id.* at 89.

Thus, Michael McKay and Robert McKay were permitted to retain their positions in the AMO.[9]  Michael McKay and Robert McKay were also both nominated for and campaigned for reelection in the December 2006 election.  (D.E. No. 190, Joint Stipulation at 11).  The AMO

---

[8]Plaintiffs' Exhibit 161 are the minutes of the meeting of the National Executive Committee held on September 29, 2005.  These minutes were not "verbatim minutes" but rather notes taken at the meeting.  Bethel Tr. Testimony July 7 at 86, 93-94.

[9]Indeed, after the McKays were indicted and throughout the course of their criminal trial, the remaining non-defaulting Defendants continued to support them.  Bethel Tr. Testimony July 7 at 92-93.

election ballots were counted on December 6, 2006.  *Id*.  Defendant Michael McKay defeated

Plaintiff Hearn for the office of AMO National President.  *Id*.  Defendant Robert McKay was

defeated in his attempt to win reelection to the office of AMO National Secretary-Treasurer.  *Id*.

Plaintiff Bartlett was defeated by Defendant Bethel for the position of Vice President.  *Id*.

Plaintiff  Harkins was defeated by Defendant Gremelsbacker for National Vice President, Deep

Sea.  *Id*.  Plaintiff Mallon was defeated by Defendant Hafner for a position on the National

Executive Board, Inland Waters and Plaintiff Rousselle was defeated by Defendant Kiefer for the

office of National Assistant Vice President, At Large.  *Id*. at 11-12.

**C.    Criminal Trial and Conviction**

The criminal trial was conducted in November and December of 2006 and finished in

early January of 2007 before the Honorable James I. Cohn in the United States District Court for

the Southern District of Florida.  *See* (D.E. No. 190, Joint Stipulation at 9).  At trial, Thomas

Kelly, the former AMO Vice President, Deep Sea, testified for the government. Kelly Tr.

Testimony July 8 at 3.[10] Thomas Kelly previously pleaded guilty to embezzlement from a labor

organization and testified at the McKay criminal trial pursuant to his plea agreement.  D. Exh.

212; Kelly Tr. Testimony July 8 at 3. On January 5, 2007, Defendants Michael McKay and

Robert McKay were found guilty of committing a RICO conspiracy, mail fraud, and failing to

---

[10]Defendant Gremelsbacker also testified at trial for the government and was granted use immunity for his testimony, meaning only that his testimony could not be used in any respect in a prosecution against him for an offense which he committed prior to the grant of immunity. Gremelsbacker Tr. Testimony July 7 at 121.  *See also United States v. Harvey*, 869 F. 2d 1439, 1450 (11th Cir. 1989) (Clark, J., dissenting) (explaining the difference between transactional immunity and use immunity and noting that use immunity only "protects the individual from prosecution through the use of the immunized testimony or evidence derived from that testimony.").  Gremelsbacker has never been indicted or prosecuted.

maintain records required by the LMRDA.  (D.E. No. 190, Joint Stipulation at 10). Defendant

Michael McKay was also found guilty of falsifying a required record and certified information

pertaining to an employee benefit plan.[11]  *Id*.  In addition, Defendant Robert McKay was found

guilty of committing theft or embezzlement from a labor organization and of making a false entry

in records required by the LMRDA.  *Id*.

 After the McKays were convicted, the other Defendant officers took immediate steps to

ensure that the McKays had no further connection with the AMO.  Bethel Tr. Testimony July 8 at

155-56.   Michael McKay wanted to remain in the position of AMO National President until

sentencing; however, Bethel and Defendant Smith, met with Michael McKay and told him that

this was not acceptable and if he did not resign, the executive board would bring charges against

him and impeach him.  *Id*. at 156.  The executive board was in the process of drafting the papers

to impeach him and had a meeting scheduled to start this process when they received a

resignation letter from Michael McKay.  *Id*.  As noted above, Robert McKay was not reelected

and had no ongoing involvement with the union at the time of his conviction.  However, Michael

McKay did attempt to put Robert McKay on the payroll as a consultant after the trial concluded.

*Id*.  Bethel immediately put a stop to this telling the controller that if Robert McKay was added to

the payroll the controller would no longer have a job.  *Id*. at 156-57.  The officers also told the

McKays that they were no longer permitted on the property, removed their access to any

computers or files, and requested that the McKays return all keys and union equipment.  *Id*. at

157.

---

[11]Defendant Michael McKay was acquitted on the charge of theft or embezzlement from
an employee benefit plan.  (D.E. No. 190, Joint Stipulation at 10).

The AMO National Executive Committee voted and appointed Defendant Bethel as AMO National President.[12] D. Exh. 124.  The Defendant officers adopted a resolution in early January 2007, which authorized AMO's special counsel and general counsel to institute a lawsuit and take other steps, as appropriate, pursuant to 29 U.S.C. § 501 to recover damages and otherwise remedy the McKays' misconduct.  D. Exh. 123. However, based on a number of considerations, the officers decided not to immediately file a civil lawsuit.

First, the DOJ informed the officers that they would pursue all restitution owed to the union.  Bethel Tr. Testimony July 8 at 159.  The criminal restitution order, as well as the criminal forfeiture order would have priority over any civil judgment the AMO could obtain against the McKays.  *Id.*[13]  In addition, the AMO maintained an insurance policy with a bonding company, Fireman's Fund.  *See* D. Exhs. 125, 215, 217.   The AMO found that recovery of losses through the bonding company was more cost-effective for the union than expending legal fees and other resources pursuing a civil lawsuit against the McKays.[14]  Bethel Tr. Testimony July 8 at 159, 161.

---

[12]Shortly after the December 6, 2006 election, the incumbent McKay administration enacted "Resolution 3," an amendment to the AMO Constitution that gave the AMO National Executive Board the authority to designate by majority vote of the National Executive Committee the successor in office to the current AMO National President amongst the existing members of the committee should the current president, who was Michael McKay, be unable to carry out his duties.  (D.E. No. 190, Joint Stipulation at 12-13).

[13]McKays were required to make restitution to the AMO in the amount of $98,410.39.  D. Exh. 125.

[14]In March 2007, the AMO, through its National Executive Board, submitted claims with the bonding company, Fireman's Fund, seeking reimbursement of any and all monies that were embezzled from the AMO by the McKays.  D. Exhs 125, 215, 217.  Bethel Tr. Testimony July 8 at 163-64.  The bonding company has accepted AMO's claims in full and the AMO has already been paid $155,178 for losses attributable to the McKays.  D. Exh. 226.

The current officers also chose to conduct a more detailed accounting of the McKays'
misconduct to ensure that all of the monies due to the AMO were recovered.  *Id*. at 159.  The
AMO retained Dan Anderson, a former FBI agent, to review the McKays' expense reports to
determine whether the criminal restitution order covered the full losses to the union.  *Id*. at 159.

### D.     Remaining Claims

On February 16, 2007, Plaintiffs filed their own three-count civil complaint.[15]  *See* (D.E.
No. 1).  Only portions of Count II, alleging a breach of Defendants' fiduciary duty relating to the
payment of year-end bonuses and the rigging of certain elections and referenda, remain pending.

### 1.     Year-End Bonuses

Plaintiffs' first remaining claim relates to the award of year-end bonuses in 1998 and
1999.  Plaintiffs argue that these bonuses were improperly awarded as reimbursement for
political contributions. On November 9, 1998, a National Executive Board meeting was held in
Dania Beach.  P. Exh. 13.[16]  All of the Defendant officers were present at this meeting.  *Id*.  At
this meeting, then-president McKay asked general counsel about his ability to grant year-end
bonuses to employees, officers, and representatives who performed beyond expectations.  Bethel
Tr. Testimony July 7 at 57; Gremelsbacker Tr. Testimony July 7 at 137.  The general counsel
looked at the AMO Constitution and said McKay could award bonuses.  Bethel Tr. Testimony
July 7 at 57.  McKay wanted authorization to give bonuses at his discretion, and the board took a

---

[15]Plaintiffs also filed an Application for Leave of Court to Sue Pursuant to 29 U.S.C. §
501(b) which this Court granted.  *See* (D.E. No. 40).

[16]Plaintiffs' Exhibit 13 are the minutes of this November 9, 1998 meeting.  As with the
other minutes referenced in this Order, these minutes are not a verbatim reporting of what
happened at the meeting.  Kelly Tr. Testimony July 8 at 37.

vote and approved the awarding of bonuses at his discretion.  *Id*.  The remaining non-defaulting

Defendants were in favor of the bonuses, as they are normal and customary in the industry.  *Id*.

All remaining non-defaulting Defendants testified that there was nothing said at this meeting

linking the bonuses to campaign contributions.  Bethel Tr. Testimony July 7 at 57-58, 70;

Gremelsbacker Tr. Testimony July 7 at 139; Nilsson Tr. Testimony July 8 at 183-84; Kiefer Tr.

Testimony July 9 at 7; Smith Tr. Testimony July 9 at 31-32; Cree Tr. Testimony July 9 at 79-

80.[17]   Non-party Michael Kowler, an accountant who works for a firm that is the AMO's

independent auditor, testified that he attended this meeting and that he does not recall any

discussion about reimbursing people for contributions with bonuses and that he would have

objected if there had been such a discussion.  Kowler Tr. Testimony July 9 at 41.  Several

Defendants specifically testified that they believed that the bonuses were awarded based on merit

rather than for reimbursement for political contributions.  Bethel Tr. Testimony July 7 at 71-72;

Nilsson Tr. Testimony July 8 at 184; Kiefer Tr. Testimony July 9 at 7, 10; Smith Tr. Testimony

July 9 at 32. *See also* Gremelsbacker Tr. Testimony July 7 at 148-49.

Thomas Kelly,[18] testified at trial that, at the November 9, 1998 National Executive Board

meeting, he heard then-President McKay tell the board members that they should each contribute

$1,000 to Congressman Shuster and "in the same breath we were advised that the bonuses would

be given out in the near future."  Kelly Tr. Testimony July 8 at 40.  Kelly testified that at this

---

[17]Defendant Bethel further testified that he was aware that reimbursement for political campaign contributions in this manner would be illegal and if this had been proposed he would have stood up in the room and objected.  Bethel Tr. Testimony July 7 at 70.

[18]During the relevant time period Thomas Kelly was National Vice President, Deep Sea. Kelly Tr. Testimony July 8 at 2.  He held the position until December 31, 2001. *Id*.

meeting, McKay made it clear that officers were to give a campaign contribution and that they would receive a bonus as reimbursement. *Id*. at 73-74.[19]   However, not all officers who received bonuses actually made campaign contributions. Bethel Tr. Testimony July 7 at 71; Kiefer Tr. Testimony July 9 at 7.  *See also* D. Exh. 163.   In addition, in 1998, Nilsson only contributed $500 rather than the "required" $1,000; however, he still received a $1000 bonus.  D. Exh. 163; Nilsson Tr. Testimony July 8 at 182.

Moreover, Thomas Kelly previously testified that when former FBI agent Lucca interviewed him as a part of the special investigation he told him that he was the only officer involved in any scheme to reimburse people for political contributions. Kelly Tr. Testimony July 8 at 64-65.  In contrast, at trial, Thomas Kelly testified that he lied to Lucca. Kelly Tr. Testimony July 8 at 43. In addition, as previously stated, Thomas Kelly is a convicted felon, having already plead guilty to embezzlement from a labor organization.  *Id*. at 3.  Finally, having had the benefit of observing the demeanor of the witnesses as they testified in open court, the Court finds that the remaining non-defaulting Defendants were more credible witnesses than Thomas Kelly. Thus, the Court finds that the remaining non-defaulting Defendants did not authorize and were not aware of a scheme to award bonuses as reimbursement for campaign contributions.

## 2.       Election Rigging

The other remaining claim in this case is that Defendants Bethel and Gremelsbacker breached their fiduciary duties by participating in, condoning, or failing to report the rigging of

---

[19]Kelly also testified that if McKay said he wanted officers to contribute, the officers would not have gone against his wishes and they all would have made the contribution.  Kelly Tr. Testimony July 8 at 74.

elections.[20]  At trial, Bethel testified that he had no knowledge of any alleged election tampering activities. Bethel Tr. Testimony July 7 at 62-63.  He testified that the Department of Labor investigated a variety of allegations of impropriety in connection with the 1996 election and dismissed the allegations after determining that no violation of the LMRDA had occurred. Bethel Tr. Testimony July 8 at 152-54.  Among other findings, the Department of Labor investigation found that there were no violations with regard to the ordering, storing, handling or accounting of the ballots.  *Id*. at 154.

        Gremelsbacker testified that he destroyed ballots in mid-1994, months after the 1993 election had already concluded, and that the ballots he destroyed were the blank ballots containing the misspelling of Jimmie Dale Alexander's name. Gremelsbacker Tr. Testimony July 7 at 125-128.  *See* P. Exh. 5; D. Exhs. 198-199.  He further testified that Thomas Kelly, who was then his boss and had been with the union for more than a decade, told him that shredding the ballots would not meet the requirements of the regulations. Gremelsbacker Tr. Testimony July 7 at 128.  Thus, Gremelsbacker had to take the ballots home and burn them and was not permitted simply to shred the ballots at the office.  *Id*.  He stated that he never destroyed any other ballots. *Id*. at 129, 131.

        In contrast, Thomas Kelly testified at trial that to rig AMO elections and referenda, Kelly and his confederates would covertly enter the polling area during the evening after the first day of the two-day voting process, take the ballot box to a secure area, remove the ballots and then replace those cast against the election of the incumbent AMO officers or their favored position

---

        [20]Michael McKay was convicted of rigging the 1993 and 1996 elections and two referenda in 1993 and 1995.  Gremelsbacker Tr. Testimony July 7 at 134.

on the referendum in question. Kelly Tr. Testimony July 8 at 11, 20-25, 28-29, 30.  He testified that in the 1993 election he told Gremelsbacker to destroy the removed ballots by burning them at his home and that Gremelsbacker reported back to him the next morning stating that the ballots had been destroyed.  *Id*. at 26.  Kelly also testified that Gremelsbacker destroyed ballots at another time, although he is unsure whether it was during the 1996 election of officers or the 1995 referendum.  *Id*. at 28, 31-32.  He testified that, as with the first time, Gremelsbacker reported back to him that the ballots had been burned.  *Id*. at 32.

Thomas Kelly also testified that he informed Bethel of the illegal rigging of the 1993 and 1996 elections and illegal rigging of the 1993 and 1995 AMO referenda, relating to the affiliation of the union with its current parent organization, the Seafarers International Union, while Bethel and Thomas Kelly were staying together in Washington D.C. *Id*. at 30, 33-34.  However, in previous statements Thomas Kelly made relating to the rigging of union elections, he did not name Bethel as a person who knew about the election misconduct.  Kelly Tr. Testimony July 8 at 52-60.  Finally, having had the benefit of observing the demeanor of the witnesses as they testified in open court, the Court finds that the testimony of Defendants Bethel and Gremelsbacker on this issue was more credible than Thomas Kelly's testimony on this issue. Thus, the Court finds that neither Defendant Bethel nor Defendant Gremelsbacker was aware of or participated in election rigging.

## II.  Conclusions of Law

This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331. In Count II, the remaining count in this action, Plaintiffs allege a violation of section 501(a) of the LMRDA, 29 U.S.C. § 501(a), which sets forth the fiduciary responsibilities of the officers of

a labor organization.[21]  In considering a section 501 claim, the Eleventh Circuit has stated that the

Court's review of these claims is limited and that courts should not "interfere broadly in internal

union affairs."  *Council 49, Am. Fed'n of State, County, and Mun. Employees Union AFL-CIO v.*

*Reach*, 843 F. 2d 1343, 1347 (11th Cir. 1988).  "Section 501 is not an invitation for courts to

substitute their judgment on how a union should be managed for that of the union officers."  *Id*.

     To the extent Plaintiffs' claims are based on their allegation that the remaining non-

defaulting Defendants aided and abetted the defaulting Defendants, Michael and Robert McKay,

in their breach of fiduciary duty, Plaintiffs must demonstrate the following: "(1) a fiduciary duty

on the part of the primary wrongdoer, (2) a breach of this fiduciary duty, (3) knowledge of the

breach by the alleged aider and abettor and (4) the aider and abettor's substantial assistance or

encouragement of the wrongdoing." *AmeriFirst Bank v. Bomar*, 757 F. Supp.1365, 1380 (S.D.

Fla.1991).

     Plaintiffs have two remaining claims in this action.  First, they argue that Defendants

Bethel, Nilsson, Smith, Cree, Gremelsbacker, and Keifer breached their fiduciary duties by

---

[21]Section 501(a) states:
The officers, agents, shop stewards, and other representatives of a labor
organization occupy positions of trust in relation to such organization and its
members as a group. It is, therefore, the duty of each such person, taking into
account the special problems and functions of a labor organization, to hold its
money and property solely for the benefit of the organization and its members and
to manage, invest, and expend the same in accordance with its constitution and
bylaws and any resolutions of the governing bodies adopted thereunder, to refrain
from dealing with such organization as an adverse party or in behalf of an adverse
party in any matter connected with his duties and from holding or acquiring any
pecuniary or personal interest which conflicts with the interests of such
organization, and to account to the organization for any profit received by him in
whatever capacity in connection with transactions conducted by him or under his
direction on behalf of the organization.
29 U.S.C. § 501(a).

participating in and approving a scheme where bonuses were improperly granted as a reimbursement to certain employees who made political contributions.  Second, Plaintiffs argue that Defendant Bethel breached his fiduciary duties by knowingly failing to protect against the rigging of elections[22] and that Defendant Gremelsbacker breached his fiduciary duties by both participating in the rigging of elections and by knowingly failing to protect against the rigging of elections.  After careful consideration, the Court finds that Defendants Bethel, Nilsson, Smith, Cree, Gremelsbacker, and Keifer did not breach their fiduciary duties nor did they aid and abet the defaulting Defendants in breaching their fiduciary duties.[23]

---

[22]At trial, Plaintiffs clarified that they were not alleging that Bethel directly participated in the rigging of elections or referenda.  Tr. Transcript July 7 at 17.

[23]To the extent Plaintiffs are attempting to claim that Defendants Bethel, Nilsson, Smith, Cree, Gremelsbacker, and Keifer breached their fiduciary duties under section 501(a) by knowingly failing to investigate the wrongdoing of defaulting Defendants Michael and Robert McKay, by knowingly failing to disclose that wrongdoing to the AMO membership, by knowingly failing to remedy that wrongdoing, and by continuously acting to protect the defaulting Defendants rather than the AMO membership, the Court finds these claims to be without merit.  The evidence demonstrates that the Defendant officers fulfilled their fiduciary obligations by investigating the allegations of wrongdoing and taking appropriate steps to protect the union.

When the officers became aware of the criminal investigation, they hired special counsel to help them cooperate with the government.  Bethel Tr. Testimony July 7 at 78-79.  They also launched their own internal investigation.  *Id*. at 79, 146-47.  Lucca Tr. Testimony July 9 at 58-59.  Special counsel's internal investigation did not reveal any financial irregularities; however, a number of recommendations were made by counsel to further regulate the conduct of officers and to further regulate incoming and outgoing funds.  D. Exh. 119 at 3-4.  All of these recommendations were followed.  Bethel Tr. Testimony July 8 at 147-49.

After the McKays were indicted, their check-writing privileges were suspended and Robert McKay was required to resign as a union-designated trustee of various employee benefit plans.  Bethel Tr. Testimony July 7 at 83-84.  The officers held a meeting to discuss the indictment and decide how the union should proceed.  *Id*.  At this meeting, the McKays denied all of the allegations in the indictment asserted against them.  *Id*. at 85.  Special counsel correctly advised the officers that an indictment is simply a list of allegations.  *Id*. at 89. The indictment is not evidence of guilt and defendants are presumed by the law to be innocent.  *In re Winship*, 397 U.S. 358, 364 (1970).  Special counsel also advised that the government would not release

A.      **Year-End Bonuses**

Plaintiffs argue that Defendants Bethel, Nilsson, Smith, Cree, Gremelsbacker, and Keifer

breached their fiduciary duties by participating in and approving a scheme where year-end

bonuses in 1998 and 1999 were improperly awarded as a reimbursement to certain employees

who made political contributions. Section 501(a) specifically provides that labor union officers

have a duty to properly hold, manage, invest and expend the labor organization's "money and

property." 29 U.S.C. § 501(a).  *Id*.  The Eleventh Circuit has stated that "where decisions

regarding the use of union funds have been authorized in accordance with the union's

constitution, by-laws, or other applicable governing provisions, 'a court will typically not have

cause to review the reasonableness of the [decision].'" *Id*. (quoting *Ray v. Young*, 753 F. 2d 386,

390 (5th Cir. 1986)).

In this case, while Michael McKay as president had the discretion to award bonuses and

the board to approve them under the AMO Constitution, this discretion granted by the

constitution had to be applied "in accordance with all applicable laws."  D. Exh. 100 at Art.

XXVII.  A labor union's conferral of bonuses as a reimbursement to members for political

_____

evidence prior to the trial for the AMO to perform its own investigation and thus, special counsel
recommended that the union keep everything at status quo for the time being.  *Id*.  Based on this
advice, the other Defendant officers allowed the McKays to retain their positions and to seek
relection in 2006.  *Id*. at 88.  There is no credible evidence that the officers made this decision
knowing that the McKays were guilty of wrongdoing or that the officers in any way breached
their duties by allowing the McKays to stay in office.
         As soon as the McKays were convicted, the officers took immediate action.  Michael
McKay was required to resign.  Bethel Tr. Testimony July 8 at 155-56.  In addition, the officers
immediately sought to make sure that the union recovered all funds that had been embezzeled
from the union.  Bethel Tr. Testimony July 8 at 156, 161; D. Exhs. 123, 125, 215, 217.  Thus, the
Court finds that the manner in which the officers handled the investigation and later conviction
of the McKays was not in breach of their fiduciary duty to the union.

contributions to a Congressman is unlawful.  *See* 2 U.S.C. § 441b(a) (stating that "[i]t is unlawful

for . . . any labor organization to make a contribution or expenditure in connection with any

election at which presidential and vice presidential electors or a Senator or Representative in, or a

Delegate or Resident Commissioner to, Congress are to be voted for, . . . or any labor

organization to consent to any contribution or expenditure by the . . . labor organization . . .

prohibited by this section.").  Thus, bonuses awarded as reimbursement for political

contributions were not authorized by the union's constitution.

Moreover, authorization "is not a complete defense to an accusation of breach of

fiduciary duty under section 501."  *Id*.  As section 501 was adopted primarily in reaction to

corruption among union officials, "[w]here a union officer personally benefits from union funds,

a court in a section 501 suit may determine whether the expenditure of funds, notwithstanding its

authorization is so manifestly unreasonable as to evidence a breach of fiduciary duty."  *Id*.  Here,

there is evidence that a number of union officers received these bonuses and thus directly

benefitted from this expenditure.[24]  *See* D. Exh. 163.  Therefore, in this case, where the

expenditure of union funds is alleged to be unauthorized and union officials have directly

benefitted,[25] judicial deference is not required and this Court is "free to determine whether an

expenditure was so unreasonable as to constitute a breach of fiduciary duty under section 501."

_____

[24]It is immaterial that every officer did not receive a bonus for purposes of considering whether officers directly benefitted.  *See Reach*, 843 F. 2d at 1348 n.4 (noting that the district court properly held board members jointly and severally liable for knowingly permitting the Executive Director to benefit from union funds.).

[25]The Court notes that if either factor is present, that the action was unauthorized or that an officer directly benefitted, the Court is free to determine whether or not the expenditure was unreasonable.  *Reach*, 843 F. 2d at 1347.

*Reach*, 843 F. 2d at 1347.

After careful consideration, the Court finds that even if these bonuses were meant to be reimbursement for political contributions by then-president McKay, there is no credible evidence that Defendants Bethel, Nilsson, Smith, Cree, Gremelsbacker or Keifer participated in, approved, or even had knowledge of such a scheme. The remaining non-defaulting Defendants each testified that they had no knowledge of any such scheme.   Bethel Tr. Testimony July 7 at 57-58, 70; Gremelsbacker Tr. Testimony July 7 at 139; Nilsson Tr. Testimony July 8 at 183-84; Kiefer Tr. Testimony July 9 at 7; Smith Tr. Testimony July 9 at 31-32; Cree Tr. Testimony July 9 at 79-80.   The evidence presented at trial was that these bonuses were awarded based on work performance.  Bethel Tr. Testimony July 7 at 71-72; Nilsson Tr. Testimony July 8 at 184; Kiefer Tr. Testimony July 9 at 7, 10; Smith Tr. Testimony July 9 at 32. *See also* Gremelsbacker Tr. Testimony July 7 at 148-49.  This trial testimony was consistent with each of the remaining non-defaulting Defendants' prior statements to two former FBI agents who conducted interviews of the officers as a part of an internal investigation in 2000.  Lucca Tr. Testimony July 9 at 64-65. Awarding year-end merit-based bonuses is a commonplace occurrence in business.  Moreover, in this case, none of the year-end bonuses were of such a high amount that they could be considered manifestly unreasonable.

The Court acknowledges that nonparty Thomas Kelly, a former AMO officer, testified that Michael McKay announced his intention to award bonuses as reimbursement for political contributions at a National Executive Board meeting on November 9, 1998.  Kelly Tr. Testimony July 8 at 40, 73-74.  However, the Court finds that Thomas Kelly's testimony is not credible. First, Defendants Bethel, Gremelsbacker, Nilsson, Kiefer, Smith and Cree all testified that no

such statement was made at this meeting. Bethel Tr. Testimony July 7 at 57-58, 70; Gremelsbacker Tr. Testimony July 7 at 139; Nilsson Tr. Testimony July 8 at 183-84; Kiefer Tr. Testimony July 9 at 7; Smith Tr. Testimony July 9 at 31-32; Cree Tr. Testimony July 9 at 79-80. In addition, nonparty Michael Kowler, who was present at this meeting also testified that no such statement was made at this meeting.  Kowler Tr. Testimony July 9 at 41.

Second, not all officers who received bonuses actually made campaign contributions. Bethel Tr. Testimony July 7 at 71; Kiefer Tr. Testimony July 9 at 7.  *See also* D. Exh. 163.  In addition, in 1998 Defendant Nilsson only contributed $500 to a political campaign but still received a $1000 bonus.  Nilsson Tr. Testimony July 8 at 182.  Third, this Court finds Thomas Kelly's testimony is not credible because he previously made statements that are inconsistent with his current testimony and because Thomas Kelly is a convicted felon, having already plead guilty to embezzlement from a labor organization.  Kelly Tr. Testimony July 8 at 3, 43, 64-65. Finally, having had the benefit of observing the demeanor of the witnesses as they testified in open court, the Court finds that the remaining non-defaulting Defendants were more credible witnesses than Thomas Kelly. Thus, the Court finds that Defendants Bethel, Gremelsbacker, Nilsson, Kiefer, Smith and Cree did not breach their fiduciary duties or aid and abet the McKays in breaching their fiduciary duties with respect to the awarding of year-end bonuses in 1998 and 1999.

**B.      Election Rigging**

Plaintiffs also argue that Defendant Bethel breached his fiduciary duties by knowingly failing to protect against the rigging of elections and referenda in the 1990s.  They argue that Defendant Gremelsbacker breached his fiduciary duties by both participating in the rigging of

elections and referenda in the 1990s and by knowingly failing to protect against the rigging of

elections and referenda in the 1990s. Claims relating to elections are generally brought under

section 401 of the LMRDA, *see Cefalo v. Moffett*, 449 F. 2d 1193, 1200 (D.C. Cir. 1971);

however, claims under section 501 are not prohibited especially where as in this case, Plaintiffs

are not attempting to set aside an election. *See Local No. 82, Furniture and Piano Moving,*

*Furniture Store Drivers, Helpers, Warehousemen and Packers v. Crowley*, 467 U.S. 526, 541 n.

16 (1984).  Moreover, the Eleventh Circuit has stated that a union official's duty to its union

should be interpreted broadly and is not confined to a union official's financial dealings.  *See*

*United States v. Browne*, 505 F. 3d 1229, 1266 (11th Cir. 2007).  Thus, the rigging of elections

could be a violation of an officer's fiduciary duty under section 501(a).  However, after careful

consideration, the Court finds that there is no credible evidence that Defendants Gremelsbacker

and Bethel breached their fiduciary duties in this manner.

At trial, Defendant Bethel denied that he had any knowledge of election or referenda

tampering.  Bethel Tr. Testimony July 7 at 62-63. He acknowledged that the Department of

Labor investigated a number of allegations relating to the 1996 election; however, the

Department of Labor found that there were no violations with regard to the ordering, storing,

handling or accounting of the ballots.  *Id*. at 152-154.

Defendant Gremelsbacker testified that he destroyed ballots in mid-1994, months after

the 1993 election had already concluded.  Gremelsbacker Tr. Testimony July 7 at 125-128.  He

testified that the ballots he destroyed were the blank ballots containing the misspelling of Jimmie

Dale Alexander's name. Gremelsbacker Tr. Testimony July 7 at 125-128.  *See* P. Exh. 5; D.

Exhs. 198-199.  Thus, the ballots he destroyed had no effect on the 1993 election.  He stated that

he never destroyed any other ballots.  *Id*. at 129, 131.

Again, the Court acknowledges that nonparty Thomas Kelly testified to the contrary.  He testified that he informed Bethel of the illegal rigging of elections and referenda.[26]  Kelly Tr. Testimony July 8 at 30, 33-34.  He also testified that he instructed Gremelsbacker to destroy actual ballots and not blank ones on the night of the 1993 election and that Gremelsbacker destroyed ballots relating to another election.  *Id*. at 26, 28, 31-32.  However, the Court finds Bethel's and Gremelsbacker's testimony is more credible than Thomas Kelly's testimony.

First, in previous statements Thomas Kelly made relating to the rigging elections, he did not name Bethel as a person who was aware of this misconduct.  Kelly Tr. Testimony July 8 at 52-60.  In addition, as previously stated Thomas Kelly is a convicted felon while Bethel and Gremelsbacker are not.  The Court also finds that the evidence supports Gremelsbacker's contention that he was asked to destroy blank ballots based on the misspelling of a candidate's name.  *See* P. Exh. 5; D. Exhs. 198-199. Finally, having had the benefit of observing the demeanor of the witnesses as they testified in open court, the Court finds that the testimony of Defendants Bethel and Gremelsbacker on this issue was more credible than Thomas Kelly's testimony on this issue.   Thus, the Court also finds that Defendants Bethel and Gremelsbacker did not breach their fiduciary duties or aid and abet the McKays in breaching their fiduciary duties with respect to the rigging of elections and referenda in the 1990s.

**ORDERED AND ADJUDGED** that

1.      On Count II, the only remaining count in this case, judgment shall be entered in

_____

[26]It is unclear exactly when Thomas Kelly is stating that he informed Bethel about the rigging of elections and referenda.

-24-

favor of the remaining non-defaulting Defendants and against Plaintiffs.  Pursuant to Federal

Rule of Civil Procedure 58, judgment shall be entered by separate written order in accordance

with these findings of fact and conclusions of law.

      2.      This Case is **CLOSED** and all pending motions are **DENIED** as **MOOT**.

      DONE AND ORDERED in Chambers at Miami, Florida, this 24 day of October, 2008.

                                    JOSE E. MARTINEZ
                                    UNITED STATES DISTRICT JUDGE

Copies provided to:
Magistrate Judge Brown
All Counsel of Record

-25-